UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ALFREDO VOLLOLDO and GUSTAVO
F. VILLOLDO,

                                    Plaintiffs,

            -against-                                    1:14-mc-0025 (LEK/CFH)

FIDEL CASTRO RUZ, *et al*.,

                                    Defendants.

_____

## MEMORANDUM-DECISION and ORDER

## I.      INTRODUCTION

        In the present action, Plaintiffs Alfredo Volloldo and Gustavo F. Villoldo ("Plaintiffs") seek

to enforce a default judgment against the Republic of Cuba ("Cuba") and various Cuban entities and

officials (collectively, "Defendants").  Dkt. No. 6 ("1610(c) Motion") at 2.  Plaintiffs brought suit

against Defendants in the Eleventh Judicial Circuit in and for Miami-Dade County, asserting acts of

torture under the Foreign Sovereign Immunities Act's ("FSIA") terrorism exception, 28 U.S.C.

§ 1605A.  Id.  On August 19, 2011, the Florida state court entered a default judgment in favor of

Plaintiffs in the amount of $2.79 billion.  Id.  On October 25, 2012, the Southern District of New

York extended full faith and credit to the Florida judgment, and on May 15, 2014, Plaintiffs

commenced the present action by registering the Southern District of New York judgment in the

Northern District.  Id. at 2-3; Dkt. No. 1.[1]

_____

[1] See 28 U.S.C. § 1963 ("A judgment in an action for the recovery of money or property
entered in any . . . district court . . . may be registered by filing a certified copy of the judgment in
any other district . . . when the judgment has become final by appeal or expiration of the time for
appeal . . . .  A judgment so registered shall have the same effect as a judgment of the district court
of the district where registered and may be enforced in like manner.").

Presently before the Court are three Petitions filed by Plaintiffs seeking an order directing Thomas P. DiNapoli, New York State Comptroller (the "Comptroller"), to turn over assets located in the Northern District that are blocked pursuant to the Cuban Asset Control Regulations ("CACR"), 31 C.F.R. Part 515, and are being held by the Comptroller as custodian of abandoned property. Dkt. Nos. 7 ("Trans-Cuba Petition"); 17 ("Cuban Entities Petition"); 21 ("Escheated Accounts Petition"). Specifically, Plaintiffs seek turnover of (1) Compania Petrolera Trans-Cuba ("Trans-Cuba") accounts, (2) Banco Nacional de Cuba ("Banco Nacional") and other Cuban corporation accounts, and (3) accounts that have allegedly escheated to Cuba under its abandonment and inheritance laws. Trans-Cuba Pet.; Cuban Entities Pet.; Escheated Accounts Pet. The Comptroller has filed Responses opposing Plaintiffs' Petitions. Dkt. Nos. 27 ("Comptroller Response – First and Second Petitions"); 39 ("Comptroller Response – Escheated Accounts Petition"). The United States has filed a statement of interest pursuant to 28 U.S.C. § 517, opposing Plaintiffs' Petitions. Dkt. No. 46 ("United States Statement of Interest"). Plaintiffs have also filed a Motion for entry of a 28 U.S.C. § 1610(c) order. 1610(c) Mot.

## II.     BACKGROUND

### A. Factual Background

The following facts are drawn from the Florida state court's findings of fact. Dkt. No. 6-8 ("Florida Judgment"). Plaintiffs are the sons of Gustavo Villoldo Argilagos, a dual citizen of the United States and Cuba. Id. at 2. Before the Cuban Revolution in January 1959, Mr. Villoldo was a successful businessman in Cuba and owned several businesses, including one of the first General Motors dealerships in Cuba, and held numerous pieces of real estate. Id. at 3. After the Revolution, Mr. Villoldo and his family were targeted by Defendants on account of Mr. Villoldo's wealth and

2

American citizenship. Id. at 3-4. Mr. Villoldo and his sons were imprisoned, beaten, and threatened with execution. Id. at 4-5. On several occasions, Mr. Villoldo was removed from his home at gunpoint. Id. at 5. He was told repeatedly that his family would be killed unless he surrendered his property and took his own life. Id. On February 16, 1959, Mr. Villoldo's body was found in his home, the result of an apparent suicide. Id. Plaintiffs fled Cuba and have resided in the United States since 1960. Id. at 2. Defendants have continued to pursue efforts to assassinate Plaintiffs and have threatened Plaintiffs with assassination as recently as 2003. Id. at 5.

## B. Procedural History

Defendants were duly served with process in the Florida state proceedings but failed to appear. Florida Judgment at 2. On August 19, 2011, following a non-jury trial, the Florida state court found that Defendants were liable under 28 U.S.C. § 1605A for acts of torture committed against Plaintiffs. Id. at 6. The court awarded Plaintiffs $2.79 billion, including $1 billion in punitive damages. Id. at 7-8.

Plaintiffs commenced the instant action on May 15, 2014. See Dkt. No. 1. On June 6, 2014, Plaintiffs served the Comptroller's Office of Unclaimed Funds ("OUF") with a subpoena, authorized by the Court, seeking the most recent Office of Foreign Assets Control ("OFAC") report related to the CACR. Dkt. No. 27-1 ("Duvall Affidavit") ¶ 4. The OFAC report is provided annually by the Comptroller to the OFAC of the U.S. Department of the Treasury regarding assets within the OUF's possession that have been blocked pursuant to OFAC regulations, including the CACR. Id. ¶ 3. Plaintiffs subsequently filed a Motion for entry of a 28 U.S.C. § 1610(c) order and the Petitions to turnover various blocked assets held by the Comptroller. 1610(c) Mot.; Trans-Cuba Pet.; Cuban Entities Pet.; Escheated Accounts Pet. Plaintiffs have served the Comptroller with a

Writ of execution, but the Court stayed any action by Plaintiffs to enforce that Writ pending further order.  Dkt. Nos. 20; 23.

## III.  LEGAL STANDARDS

### A.  N.Y. C.P.L.R. § 5225(b)

Plaintiffs' Petitions are filed under New York Civil Practice Law and Rules ("N.Y. C.P.L.R.") § 5225(b) pursuant to Federal Rule of Civil Procedure 69.  Federal Rule of Civil Procedure 69 provides that "[t]he procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located."  FED. R. CIV. P. 69(a)(1).  Section 5225(b) provides that a judgment creditor may institute a proceeding against a third-party in possession of a debtor's funds, and "where it is shown that the judgment debtor is entitled to the possession of such property . . . the court shall require such person to pay the money."  N.Y. C.P.L.R. § 5225(b).[2]

A court "must conduct a trial on disputed issues of fact on adverse claims in a turnover matter."  HBE Leasing Corp. v. Frank, 48 F.3d 623, 633 (2d Cir. 1995) (quoting General Motors Acceptance Corp. v. Norstar Bank of Hudson Valley, 549 N.Y.S.2d 862, 863 (App. Div. 1989)); see also Port of New York Authority v. 62 Cortlandt St. Realty Co., 219 N.E.2d  797, 799 (N.Y. 1966) ("The standards of summary judgment applied to actions should also be applied by the court to [special proceedings].").  A court shall grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).

---

[2] N.Y. C.P.L.R. § 5225(b) states that a party must initiate a "special proceeding."  N.Y. C.P.L.R. § 5225(b).  However, district courts in the Second Circuit have held that a party may bring a Rule 69 motion without initiating a special proceeding.  See, e.g., N. Mariana Islands v. Millard, 845 F. Supp. 2d 579, 581 (S.D.N.Y. 2012).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998).

**B.  Cuban Assets Control Regulations**

The CACR, 31 C.F.R. Part 515, was promulgated in 1963 under § 5(b) of the Trading With the Enemy Act of 1917 ("TWEA"), 50 U.S.C. App. § 1 *et seq.* Regan v. Wald, 468 U.S. 222, 226 (1984). Section 5(b) of the TWEA authorizes the President to prohibit or regulate any transactions involving "any property in which any foreign country or a national thereof has any interest." 50 U.S.C. App. § 5(b)(1). The CACR imposed an embargo on Cuba and "w[as] originally adopted to deal with the peacetime emergency created by Cuban attempts to destabilize governments throughout Latin America." Regan, 468 U.S. at 226.

The CACR prohibits any transactions in property in which Cuba or a Cuban national "has at any time . . . had any interest of any nature whatsoever, direct or indirect," unless authorized by the Secretary of the Treasury. 31 C.F.R. § 515.201(a). Prohibited transactions include "any actual or purported act or transaction . . . the purpose, intent, or effect of which is to . . . transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect to any property." Id. § 515.310. The Secretary of the Treasury may issue a license authorizing a prohibited transaction. Id. § 515.203(c).

**C.  Foreign Sovereign Immunities Act and Terrorism Risk Insurance Act**

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in the courts

of this country." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989).

Foreign states are immune from the jurisdiction of federal and state courts unless one of the

exceptions contained in §§ 1605-1607 applies.  28 U.S.C. § 1604.  The "terrorism exception"—

codified at § 1605A—"abrogates immunity for those foreign states officially designated as state

sponsors of terrorism by the Department of State where the foreign state commits a terrorist act or

provides material support for the commission of a terrorist act and the act results in the death or

personal injury of a United States citizen." Weinstein v. Islamic Republic of Iran, 609 F.3d 43, 48

(2d Cir. 2010).  Cuba was designated as a state sponsor of terrorism in 1982. Weininger v. Castro,

462 F. Supp. 2d 457, 479 (S.D.N.Y. 2006) (citing 47 Fed. Reg. 16,623 (Apr. 19, 1982)).

The property of a foreign state is also immune from attachment unless one of the exceptions

in § 1610 applies.  28 U.S.C. § 1609.  The property of a foreign state used for a commercial activity

in the United States is not immune from attachment if "the judgment relates to a claim for which the

foreign state is not immune under section 1605A." Id. § 1610(a)(7).  The property of "an agency or

instrumentality of a foreign state engaged in commercial activity in the United States" is not

immune from attachment if "the judgment relates to a claim for which the agency or instrumentality

is not immune by virtue of section 1605A." Id. § 1610(b)(3).  A judgment holder under § 1605A

may attach the property of a state or an agency or instrumentality of such state, "including property

that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical

entity." Id. § 1610(g)(1).  "Nothing in [§ 1610(g)] shall be construed to supersede the authority of a

court to prevent appropriately the impairment of an interest held by a person who is not liable in the

action giving rise to a judgment." Id. § 1610(g)(3).

Congress enacted the Terrorism Risk Insurance Act ("TRIA"), Pub. L. No. 107-297, 116 Stat.

2322 (2002), "to 'deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets.'" Weininger, 462 F. Supp. 2d at 483 (quoting H.R. Conf. Rep. 107-779, at 27 (2002)). Section 201(a) declares that

> [n]otwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [§ 1605A], the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which the terrorist party has been adjudged liable.

TRIA § 201(a).

## IV. DISCUSSION

### A. § 1610(c) Motion

#### 1. § 1610(c)

Plaintiffs request that the Court enter a § 1610(c) order entitling them to execute upon the blocked assets of Defendants. 1610(c) Mot. Seven other district courts have granted Plaintiffs relief under § 1610(c). Id. at 2.[3]

Section 1610(c) of the FSIA provides that "[n]o attachment or execution . . . shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following entry of judgment and the giving of any notice

---

[3] See Villoldo v. Republic of Cuba, No. 13-mc-136 (D. N.J. Feb. 14, 2014); Villoldo v. Republic of Cuba, No. 13-mc-80051 (N.D. Cal. July 19, 2013); Villoldo v. Republic of Cuba, No. 13-cv-1128 (N.D. Ill. July 1, 2013); Villoldo v. Republic of Cuba, No. 13-mc-20 (D. Minn. July 1, 2013); Villoldo v. Republic of Cuba, No. 13-mc-80 (D. Conn. June 27, 2013); Villoldo v. Republic of Cuba, No. 13-mc-94014 (D. Mass. June 6, 2013); Villoldo v. Republic of Cuba, No. 13-mc-0016 (W.D. Pa. May 28, 2013).

required under section 1608(e)." 28 U.S.C. § 1610(c). Thus, before entering a § 1610(c) order, the Court must find that (1) Defendants received notice of the entry of default judgment in accordance with § 1608(e) and (2) sufficient time has passed since the entry of judgment. Plaintiffs have demonstrated that both conditions are satisfied. Service may be accomplished by "sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." 28 U.S.C. § 1608(a)(3); see also id. § 1608(e). The clerk of the Southern District of New York served Defendants with a notice of default judgment and a copy of the default judgment in accordance with § 1608(a)(3). Dkt. No. 6-17 at 9-14. A reasonable period of time has also elapsed since the entry of default judgment on October 12, 2012. See Ned Chartering & Trading, Inc. v. Republic of Pakistan, 130 F. Supp. 2d 64, 67 (D.D.C. 2001) (noting that "courts have found periods such as two or three months sufficient to satisfy section 1610(c)'s requirements"). Accordingly, Plaintiffs' 1610(c) Motion is granted.

### 2. Subject Matter Jurisdiction

The Comptroller takes no position on whether the Court should grant Plaintiffs' § 1610(c) Motion, but suggests that the Florida state court may not have had subject matter jurisdiction under the terrorism exception of the FSIA. Comp. Resp. – First and Second Pets. at 5 n.2. The terrorism exception abrogates a foreign state's sovereign immunity where (1) "money damages are sought against a foreign state for personal injury or death that was caused by an act of torture" and (2) "the foreign state was designated as a state sponsor of terrorism at the time [of] the act . . . or was so designated as a result of such act." 28 U.S.C. § 1605A. The Comptroller argues that the acts of

torture were committed before Cuba was designated a state sponsor of terrorism in 1982 and that

Cuba's designation as such was not "as a result of" the acts committed against Plaintiffs. Comp.

Resp. – First and Second Pets. at 5 n.2. Furthermore, while Defendants continued to conduct threats

and assassination attempts against Plaintiffs after 1982, the Comptroller suggests that those

activities would not qualify as "torture" because Plaintiffs were not in the "custody or physical

control" of Defendants. Id. (quoting 28 U.S.C. § 1350(b)(1) (defining "torture" as "any act, directed

against an individual in the offender's custody or physical control, by which severe pain or suffering

. . . is intentionally inflicted on that individual")).

The Full Faith and Credit Act provides that "judicial proceedings . . . shall have the same

full faith and credit in every court within the United States . . . as they have by law or usage in the

courts of such State." 28 U.S.C. § 1738. Thus, "a federal court must give to a state-court judgment

the same preclusive effect as would be given that judgment under the law of the State in which the

judgment was rendered." Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 80 (1984).

Second, "a judgment of a court in one State is conclusive upon the merits in a court in another State

only if the court in the first State had power to pass on the merits—had jurisdiction, that is, to render

the judgment." Underwriters Nat. Assur. Co. v. N.C. Life & Acc. & Health Ins. Guar. Ass'n, 455

U.S. 691, 704 (1982) (quoting Durfee v. Duke, 375 U.S. 106, 110 (1963)). "Consequently, before a

court is bound by the judgment rendered in another State, it may inquire into the jurisdictional basis

of the foreign court's decree. If that court did not have jurisdiction over the subject matter or the

relevant parties, full faith and credit need not be given." Id. at 705; see also Kremer v. Chemical

Const. Corp., 456 U.S. 461, 482 (1982) ("A State may not grant preclusive effect in its own courts

to a constitutionally infirm judgment, and other state and federal courts are not required to accord

full faith and credit to such a judgment." (footnote omitted)).

The Comptroller does not collaterally attack the Florida Judgment, but rather suggests "that it appears that the Florida court may not have had subject matter jurisdiction" under the FSIA. Comp. Resp. – First and Second Pets. at 5 n.2. The Court therefore need not consider the preclusive effect of the Florida Judgment under Florida law. See Weininger, 462 F. Supp. 2d at 472 ("In the absence of a collateral attack, a . . . state court would be bound to enforce the judgments, except to the extent that such court were to find them constitutionally infirm."). Instead, the inquiry for the Court is whether the Florida state court lacked subject matter jurisdiction to enter judgment against Defendants; specifically, whether the Florida state court erred in finding that the terrorism exception of the FSIA applied.

However, "[i]t has long been the rule that principles of res judicata apply to jurisdictional determinations—both subject matter and personal." Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 n.9 (1982). "[A] judgment is entitled to full faith and credit—even as to questions of jurisdiction—when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment." Underwriters, 455 U.S. at 706 (quoting Durfee, 375 U.S. at 111). Here, the Florida state court conducted a hearing, and found—"by evidence satisfactory to the court," 28 U.S.C. § 1608(e)—that it had subject matter jurisdiction under the terrorism exception to the FSIA. Florida Judgment at 5-6. The Southern District of New York found that the Florida Judgment is entitled to full faith and credit and not subject to attack for lack of jurisdiction. See Vera v. Republic of Cuba, 40 F. Supp. 3d 367, 376 (S.D.N.Y. 2014). Seven other district courts have also extended full faith and credit to the Florida Judgment. See supra note 3.

Weininger is instructive as to a district court's obligation to sua sponte examine the subject matter jurisdiction of a court having rendered a default judgment. In Weininger, the two plaintiffs had each obtained default judgments against Cuba in Florida state court pursuant to the FSIA's terrorism exception, and sought to enforce those judgments by petitioning for the turnover of assets in bank accounts allegedly belonging to Cuban entities. 462 F. Supp. 2d at 463-67. JPMorgan Chase Bank, N.A., seeking interpleader relief, argued that the default judgments were unenforceable because the Florida state courts lacked subject matter jurisdiction under the FSIA. Id. at 468. Cuba failed to appear in the Florida state courts or in any of the subsequent proceedings to challenge the judgment against it. Id. at 468-69. The district court posed the question as "what duty does this Court have on its own motion to reexamine the jurisdictional competence, and resultant factual and legal determinations, of courts proceeding it in the decisional order that also were under similar obligation to confirm their authority as a predicate to rendering a judgment on the merits." Id. at 469.

The court found no authority requiring it "to sua sponte engage in an analysis of the subject matter jurisdiction of the rendering court in the absence of a collateral attack by the party against whom the judgment is to be enforced." Id. at 474. The court noted that there had been two levels of review. Id. at 469. First, the Florida state courts had determined their jurisdiction pursuant to 28 U.S.C. § 1608(e), and had "held hearings, t[aken] evidence, satisfied themselves of their jurisdiction and expressly so ruled." Id. The court found that the Florida courts' findings were entitled to "presumptive validity." Id. at 475. Second, intervening federal court decisions had recognized that the plaintiffs' state court judgments were entitled to full faith and credit. Id. at 476-77.

In Jerez v. Republic of Cuba, 964 F. Supp. 2d 52 (D.D.C. 2013), the court distinguished

Weininger and reached a different conclusion. In Jerez, the plaintiff brought an action in D.C. district court to enforce a default judgment obtained against Cuba in Florida state court. 964 F. Supp. 2d at 53-54. The court considered its obligation to independently review the Florida state court's subject matter jurisdiction. Id. at 58. After discussing Weininger, the court found that the circumstances warranted an examination of the Florida court's jurisdiction. Id. at 60. First, unlike the state court in Weininger, which held hearings and took evidence, the state court in Jerez failed to discuss the FSIA. Id. Subsequent federal courts enforcing the judgment did not examine the state court's jurisdiction. Id. Second, unlike Weininger, in which no parties contested the validity of the underlying judgments, in Jerez, the third-party property holders contested the validity of the state court judgment. Id.

The present circumstances are more similar to Weininger than Jerez. Here, the Florida state court conducted a trial, took findings of fact, and found that the FSIA's terrorism exception applied. See Florida Judgment. The Southern District of New York considered a collateral attack on the Florida Judgment and found that the Florida court's findings satisfied the criteria of § 1605A. See Vera v. Republic of Cuba, 40 F. Supp. 3d 367, 376 (S.D.N.Y. 2014). Finally, the Comptroller does not collaterally attack the Florida Judgment, but merely suggests that the Florida court "may not have had subject matter jurisdiction." Comp. Resp. – First and Second Pets. at 5 n.2. Thus, like Weininger, the Court declines to independently examine the jurisdiction of the Florida Judgment.[4]

_____

[4] The Court observes that on October 30, 2015, the Secretary of State issued a final rule removing Cuba from the designated list of state sponsors of terrorism. 80 Fed. Reg. 67252-53 (Oct. 30, 2015); see also Dkt. No. 62. However, Cuba's current designation does not effect the Court's subject-matter jurisdiction over this action. The terrorism exception to the FSIA applies where "the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred or was so designated as a result of such act, and, subject to subclause (II), either remains so designated when the claim is filed under this section or was so designated within the 6-

**B. Trans-Cuba Petition**

Plaintiffs petition for the turnover of 677 accounts belonging to Trans-Cuba ("Trans-Cuba Accounts"), which are blocked pursuant to the CACR. Trans-Cuba Pet. at 2.[5] In order to attach the Trans-Cuba Accounts under the FSIA and the TRIA, Plaintiffs must demonstrate (1) that Trans-Cuba is an "agency or instrumentality" of Cuba and (2) that the Accounts are the property of Cuba.[6] See 28 U.S.C. § 1610(b); TRIA § 201(a). Plaintiffs assert that Trans-Cuba has been nationalized and that the Accounts are therefore the property of Cuba and subject to turnover to judgment creditors under the TRIA and the FSIA. Trans-Cuba Pet. at 2.

The Comptroller and the United States each oppose Plaintiffs' Petition. Comp. Resp. – First and Second Pets.; U.S. State. of Interest. The Comptroller asserts that Plaintiffs have failed to demonstrate either that Trans-Cuba is an agency or instrumentality of Cuba or that the Trans-Cuba

---

month period before the claim is filed under this section." 28 U.S.C. § 1605A(a)(2)(A)(i)(I). Cuba was designated as a state sponsor of terrorism at the time Plaintiffs filed their action. Cf. Kaplan v. Cent. Bank of Islamic Republic of Iran, 55 F. Supp. 3d 189, 199 (D.D.C. 2014) (finding that North Korea was designated as a state sponsor of terrorism at the time of the acts that caused the plaintiffs harm and remained so designated at the time they filed their action).

[5] Plaintiffs filed the OFAC report of the Trans-Cuba Accounts with the Court under seal. See Dkt. Nos. 7-1 ("Trans-Cuba OFAC Report"); 14.

[6] The FSIA defines an "agency or instrumentality" as any entity

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

Accounts are the property of Cuba.  Comp. Resp. – First and Second Pets. at 1-2.

The parties argue at length regarding previous litigation involving the Trans-Cuba accounts in Mann v. Compania Petrolera Trans-Cuba (Honey Mann), No. 11172/60 (N.Y. Sup. Ct.), and in Tole S.A. v. Miller, 530 F. Supp. 999 (S.D.N.Y. 1981), which summarizes the Honey Mann proceedings.  Briefly, Plaintiffs argue that Tole establishes that the Trans-Cuba Accounts are the property of Cuba.  See Trans-Cuba Pet.  The Comptroller argues in response that the Honey Mann proceedings in fact show that Trans-Cuba is not an agency or instrumentality of Cuba and that the Accounts are not the property of Cuba.  See Comp. Resp. –  First and Second Pets. at 10-13, 19-22.

Because the Court finds that Honey Mann establishes that the Trans-Cuba Accounts are not the property of Cuba, it does not decide the antecedent issue of whether Trans-Cuba is an agency or instrumentality of Cuba.[7]

_____

[7] The FSIA defines an "agency or instrumentality" as any entity "which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof."  28 U.S.C. § 1603(b)(2). Plaintiffs assert that Trans-Cuba was nationalized in 1960 and therefore is majority owned by Cuba. Trans-Cuba Pet. at 9.  The issue for the Court is whether the nationalization of Trans-Cuba is entitled to recognition.  Plaintiffs argue that Trans-Cuba's nationalization is entitled to recognition under the act of state doctrine.  See Dkt. No. 35 ("Plaintiffs Reply – First and Second Petitions") at 18.  The act of state doctrine provides that courts should "not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law."  Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 428 (1964).  The Comptroller argues in response that Sabbatino has been "legislatively overruled" by the Hickenlooper Amendment to the Foreign Assistance Act of 1964, codified at 22 U.S.C. § 2370(e)(2), and that the Court must examine the validity of Trans-Cuba's nationalization under the "principles of international law."  See Dkt. No. 41 ("Comptroller Surreply") at 4.  However, even assuming that Trans-Cuba is an "agency or instrumentality" of Cuba, the Court finds that Honey Mann establishes that the Trans-Cuba Accounts are not the property of Cuba.  The Court therefore declines to determine whether the act of state doctrine or the Hickenlooper Amendment applies, and thus does not decide whether Trans-Cuba is an agency or instrumentality of Cuba.

1. _Honey Mann_ Proceedings

The parties assume, without briefing, that Honey Mann is dispositive of this proceeding.

Indeed, the main evidence Plaintiffs present in support of their Trans-Cuba Petition is Honey Mann,

as summarized by Tole. See Trans-Cuba Pet. However, Plaintiffs also argue that Honey Mann is

not res judicata on the Court. Dkt. No. 35 ("Plaintiffs Reply – First and Second Petitions") at 13-16.

Thus, the Court must first address the preclusive effect of the Honey Mann proceedings.

In May 1960, Trans-Cuba, a Cuban corporation, was nationalized and all of its assets and

property appropriated by the Cuban government. Tole, 530 F. Supp. at 1000; see also Dkt. No. 17-3

("Salazar-Carrillo Affidavit") ¶¶ 7-16.[8] At the time of its nationalization, Trans-Cuba had

approximately $1.8 million on deposit in a New York bank account. Tole, 530 F. Supp. at 1000. In

August 1960, a shareholder of Trans-Cuba, Honey Mann, brought a suit pursuant to section 977-b of

the New York Civil Practice Act in New York State Supreme Court for the appointment of a

receiver of the New York assets and distribution of the assets to shareholders and creditors.[9] Id. On

---

[8] Plaintiffs have filed an Affidavit from Professor Jorge Salazar-Carrillo ("Salazar-Carrillo") in support of their Cuban Entities Petition regarding the nationalization of Cuban businesses. See Salazar-Carrillo Aff. Salazar-Carrillo is a professor in the Department of Economics at Florida International University and an associated member in the Cuban Research Institute in the School of International and Public Affairs at Florida International University. Id. ¶ 1. His research is focused on the economies and history of Latin America, including Cuba. Id. ¶ 2. Salazar-Carrillo was a Director in the Group of Economists in the Cuban Ministry of Finance throughout the Cuban revolution in 1959. Id. ¶ 3. The Court credits the Salazar-Carrillo Affidavit as an expert affidavit. See Hausler v. JP Morgan Chase Bank, N.A., No. 09-cv-10289, 2015 WL 5236481, at *30 (S.D.N.Y. Aug. 4, 2015) ("This Court and others have frequently reviewed and credited expert affidavits in making determinations of international law related to the TRIA.").

[9] Section 977-b "authoriz[ed] receiverships for New York assets of foreign corporations that have been dissolved or the property of which has been nationalized." Banco Nacional de Cuba v. Sabbatino, 193 F. Supp. 375, 377 (S.D.N.Y. 1961), rev'd on other grounds, 376 U.S. 398 (1964); see also Oliner v. Am.-Oriental Banking Corp., 297 N.Y.S. 432, 433 (App. Div. 1937) ("The statute provides that . . . the court may . . . appoint a permanent receiver to make distribution by making

August 1, 1960, a temporary receiver was appointed. Id. On April 5, 1962, a permanent receiver

was appointed and on May 3, 1963, a co-receiver was appointed. Id. The co-receivers considered

claims from persons, businesses, and other entities, including Cuba. Duvall Aff. ¶ 11. On a case-

by-case basis, the co-receivers allowed and disallowed certain claims. Id.

On July 8, 1963, the Secretary of the Treasury issued the CACR. Tole, 530 F. Supp. at

1000. Since the assets of Trans-Cuba had not yet been distributed, they were therefore immediately

blocked. Id. at 1001. On June 5, 1964, OFAC ordered the Trans-Cuba co-receivers not to make any

distributions from the assets unless a license had first been secured from OFAC. Id.

The co-receivers thereafter filed their report with the state court. Id. The report rejected all

claims made by Cuba. Duvall Aff. ¶ 11. The state court then appointed a referee to hear and

determine objections made to the report by various shareholders and creditors of Trans-Cuba. Tole,

530 F. Supp. at 1001. On January 19, 1967, the referee submitted his report to the state court. Id.;

see also Dkt. No. 27-2 ("Referee Report"). The referee appointed the Comptroller as the successor

receiver of the assets. Duvall Aff. ¶ 12. The Comptroller was directed to hold one portion of the

assets for the benefit of claimant shareholders whose claims were allowed and thus distributable to

them and to hold another portion distributable to shareholders but not ordered distributed either for

failure of proof of a claim of ownership or for failure to present such a claim. Id.. The state court

adopted the referee's report.[10] Id. A portion of Trans-Cuba's assets were then unblocked and

---

payment of claims in a designated order after notice is given to creditors filing proofs of claim.").
The New York Civil Practice Act has since been repealed by § 10001 of the New York Civil
Practice Laws and Rules. See Tole, 530 F. Supp. at 1000 n.1.

[10] The state court's order states:

FURTHER ORDERED, ADJUDGED AND DECREED, that the Comptroller as

distributed to shareholders who had received a license from the Treasury Department.  Tole, 530 F.

Supp. at 1001.  The Comptroller was directed to hold the remaining portion in his capacity as

Abandoned Property Custodian and subject to the provisions of the CACR.  Id.; Honey Mann Order

at 12-13.  In subsequent years, certain accounts were unblocked.  Tole, 530 F. Supp. at 1001.

Thus, Honey Mann was an action in rem, see Banco Nacional, 193 F. Supp. at 377, which

liquidated the assets of Trans-Cuba in New York and adjudicated the ownership of such assets.

"The essential function of an action in rem is the determination of title to or the status of property

located—physically or legally—within the court's jurisdiction.  Conceptually, in rem jurisdiction

operates directly on the property and the court's judgment is effective against all persons who have

an interest in the property."  Wright & Miller, Federal Practice and Procedure § 1070 (2d ed. 1987).

Because Plaintiffs are judgment creditors seeking to execute on Trans-Cuba's assets, they are bound

by Honey Mann's prior adjudication of the ownership of those assets.  Cf. Princess Lida of Thurn &

Taxis v. Thompson, 305 U.S. 456, 466 (1939) ("[I]t is settled that where the judgment sought is

_____

to that portion of the funds distributable to shareholders but not ordered distributed
by this order either for failure of proof of a claim of ownership or for failure to
present such claim, or for any cause, to hold said portion pursuant to the provisions
of the New York Abandoned Property Law, and subject to the provisions of the
Cuban Assets Control Regulations of the Treasury Department of July 3, 1963 as
modified by Regulations of October 6, 1965, and subject to any other appropriate
order or regulations of the United States Government or any of its agencies issued
pursuant to Congressional statute or Executive decree; except that, for a period of
six months from the date of receipt of the funds by him from the receivers, or for
such other as the court may direct, the portion of the funds described in this
decretal provision shall not be transferred by the Comptroller to the Abandoned
Property Fund, but shall be held by him subject to any further or other order of
distribution as the court may make and shall be invested by him at interest which
shall inure to the benefit of such portion and shall become part of it[.]

Dkt. No. 35-2 ("Honey Mann Order") at 11-12.

strictly in personam, both the state court and federal court, having concurrent jurisdiction, may proceed with the litigation at least until judgment is obtained in one of them which may be set up as res judicata in the other. On the other hand, if the two suits are in rem, or quasi in rem, so that the court, or its officer has possession or must have control of the property which is the subject of the litigation in order to proceed with the cause and grant the relief sought the jurisdiction of the one court must yield to that of the other."). Put another way, Plaintiffs are seeking to litigate the ownership of assets, which the Honey Mann court previously took possession of, adjudicated claims to, and distributed.

The Court is not persuaded by Plaintiffs' argument that Honey Mann is a product of collusion and therefore not binding. Pls. Reply – First and Second Pets. at 10-11, 15-16. A prerequisite of res judicata is that a judgment not be a product of fraud or collusion. Ryan v. N.Y. Tel. Co., 467 N.E.2d 487, 490 (N.Y. 1984); In re Haas, 304 N.Y.S.2d 930, 937 (App. Div. 1969). Plaintiffs assert that there was collusion between the attorneys for the shareholders moving for the appointment of a receiver and the attorneys for Trans-Cuba. Pls. Reply – First and Second Pets. at 10. Specifically, Plaintiffs argue that Cuba was denied the right to appoint lawyers for Trans-Cuba, even though it owned the company through nationalization. Id. However, attorneys for the Cuban government did appear and opposed the appointment of a receiver. Referee Report at 1. Moreover, the Cuban government appeared in the receivership proceedings as a claimant. Id. at 3. The Court finds that Honey Mann was an adversary proceeding and was not the product of collusion.

## 2. Ownership of the Trans-Cuba Accounts

The Comptroller, relying on Honey Mann, argues that Plaintiffs have failed to demonstrate that the Trans-Cuba Accounts are the property of Cuba or an agency or instrumentality of Cuba, as

required by the TRIA and the FSIA.[11]  Comp. Resp. – First and Second Pets. at 14-15.

As stated *supra*, the <u>Honey Mann</u> court fully adjudicated the ownership of Trans-Cuba's New York accounts.  The co-receivers and the referee allowed claims of shareholders of approximately 5,000,000 shares of the 9,300,000 shares outstanding.  Referee Report at 16.  The Comptroller was directed to hold one portion of the assets for the benefit of claimant shareholders whose claims were allowed and thus distributable to them and to hold another portion distributable to shareholders but not ordered distributed either for failure of proof of a claim of ownership or for failure to present such a claim.  Duvall Aff. ¶ 12.  The Comptroller holds the Trans-Cuba accounts in his capacity as Abandoned Property Custodian and subject to the provisions of the CACR.  <u>Tole</u>, 530 F. Supp. at 1001.  All of the Trans-Cuba accounts are therefore held in the name of specifically identified shareholders, with the exception of one account which is held on behalf of unknown beneficial owners.  <u>See</u> Trans-Cuba OFAC Report.  Pursuant to the Abandoned Property Law, the Comptroller has "care and custody" of abandoned funds "for the benefit of those entitled to receive the same."  N.Y. ABAND. PROP. § 1404(1); <u>see also</u> <u>id.</u> § 102 ("It is hereby declared to be the policy of the state, *while protecting the interest of the owners thereof*, to utilize escheated lands and unclaimed property for the benefit of all the people of the state." (emphasis added)).  The OUF

_____

[11] As a preliminary issue, the Court notes that the Comptroller and United States argue at length that the TRIA and the FSIA require a foreign state to actually *own* the assets subject to attachment, rather than have a mere interest.  <u>See</u> Comp. Resp. – First and Second Pets. at 15-18 (citing, *inter alia*, <u>Heiser v. Islamic Republic of Iran</u>, 735 F.3d 934, 938-40 (D.C. Cir. 2013); <u>Calderon-Cardona v. JP Morgan Chase Bank, N.A.</u>, 867 F. Supp. 2d 389, 399-400 (S.D.N.Y. 2011)); U.S. State. of Interest at 10 n.7.  However, Plaintiffs assert that the Comptroller and United States have mischaracterized their position and that they in fact allege that Trans-Cuba owns the assets in question.  Dkt. No. 53 ("Plaintiffs Response – United States Statement of Interest") at 4. Because Plaintiffs have not alleged that Cuba has a mere interest in the Trans-Cuba accounts, the Court need not decide whether a mere interest is also sufficient to make assets subject to attachment under the TRIA and the FSIA.

continues to receive claims from persons seeking funds either in their own names or through the estates of deceased owners. Duvall Aff. ¶ 29. In the past several years, the OUF has received twelve claims covering eleven accounts. Id. From January 2013 to June 2014, the OUF paid six of seven persons who were entitled to accounts and who had obtained an OFAC license. Id.

The co-receivers and the referee rejected all claims made by Cuba. Id. ¶ 11. Cuba appeared in the proceedings in a dual capacity, presenting claims as (1) the owner of Trans-Cuba and all of its assets following nationalization and (2) as a shareholder of a large number of shares. Referee Report at 3. The referee rejected both bases for Cuba's claim to the assets. See id. at 3-13.

The referee first found that Cuba was not entitled to the assets by virtue of the nationalization of Trans-Cuba. See id. at 3-9. Relying on the statement of the act of state doctrine in Sabbatino, 376 U.S. 398, which prohibits courts from examining the validity of foreign nationalization decrees, Cuba argued that § 977-b was invalid. Id. at 4. The referee, however, cited to numerous cases holding that the act of state doctrine "applies only to a taking by a foreign sovereign of property within its territory." Id. at 5 (quoting Republic of Iraq v. First Nat'l City Bank, 353 F.2d 47, 51 (2d Cir. 1965)). With respect to property within the United States, the nationalization decree was only entitled to recognition to the extent that it was consistent with federal policy. See id. at 6. The referee concluded that the taking of property without compensation was contrary to federal policy. Id. at 7.

The referee next rejected Cuba's claims as a stockholder on the ground that "it [was] not an ordinary shareholder." Id. at 10. Cuba claimed ownership of the shares of stock by virtue of the nationalization decree; a number of individuals and corporations also presented claims for those same shares. Id. The referee found that Cuba had acquired the shares of stock by "an act of

lawlessness," id. at 11, and that allowing Cuba to present them would be to allow it "to benefit from its double act of confiscation," id. at 10. The referee concluded that Cuba could not reach Trans-Cuba's New York assets directly or indirectly. Id. at 12 (citing Zwack v. Kraus Bros. & Co., 237 F.2d 255, 259 (2d Cir. 1956)).

Plaintiffs object to the Comptroller's reliance on Honey Mann on several grounds. First, Plaintiffs claim that the funds are not in fact being held for shareholders of Trans-Cuba. Pls. Reply – First and Second Pets. at 6-8. Plaintiffs argue that "[t]he former shareholders of Trans-Cuba, who have never perfected claims against the corporation, are at best creditors of the corporation, who lack a judgment or other interest in the assets at issue." Id. at 6. However, Honey Mann awarded the funds to specific shareholders and ordered the Comptroller to hold the funds pursuant to New York Abandoned Property Law. See Honey Mann Order. Under the New York Abandoned Property Law, the Comptroller holds property for "the benefit of those entitled to receive" it and has "full and complete authority to determine all . . . claims." N.Y. ABAND. PROP. §§ 1404(1); 1406(1)(b).

Plaintiffs further argue that the referee stated that the funds were owned by Cuba. Pls. Reply – First and Second Pets. at 7 (quoting Referee Report at 50 ("I think the conclusion is plain: The ownership was and remains Cuban, in the sense of being Cuban national.")). However, the referee was merely discussing the applicability of the CACR. The scope of assets blocked under the CACR is much broader than those assets subject to attachment under the TRIA and the FSIA. See Estate of Heiser v. Islamic Republic of Iran, 885 F. Supp. 2d 429, 439-40 (D.D.C. 2012) ("The expansive language OFAC employs to block transactions . . . stands in stark contrast to the language employed in TRIA § 201(a) where Congress chose to allow execution on only a subset of blocked assets: those

21

'of' a terrorist party.").

Plaintiffs next argue that the referee erred by refusing to recognize Trans-Cuba's nationalization. Pls. Reply – First and Second Pets. at 16-22. Plaintiffs first argue that Sabbatino prohibits courts from examining the validity of a foreign state's nationalization decree. Id. at 17-19. However, Sabbatino by its own terms only applies to "a taking of property [by a foreign state] within its own territory." Sabbatino, 376 U.S. at 428 (emphasis added). It is undisputed that Trans-Cuba's New York accounts were located in New York at the time of the nationalization. Numerous courts have recognized an "extraterritorial exception," refusing to give a foreign state's confiscatory decree extraterritorial effect when it is inconsistent with United States law and policy. See Republic of Iraq, 353 F.2d at 51-52 (refusing to enforce confiscatory decree with respect to property within the United States because confiscation is "contrary to our public policy and shocking to our sense of justice"); United Bank, Ltd. v. Cosmic Int'l, Inc., 542 F.2d 868, 873 (2d Cir. 1975) (same); Menendez v. Saks & Co., 485 F.2d 1355, 1364 (2d Cir. 1973) (same).

Plaintiffs further argue that recognition of Trans-Cuba's nationalization in this case is consistent with United States law and policy because it enables Americans to recover on judgments against Cuba. Pls. Reply – First and Second Pets. at 20-22. Plaintiffs rely on the Supreme Court's decision in United States v. Belmont, 301 U.S. 324 (1937) and the Second Circuit's application of that decision in Banco Nacional de Cuba v. Chemical Bank N.Y. Tr. Co. (Chemical Bank), 658 F.2d 903 (2d Cir. 1981). In Chemical Bank, Banco Nacional sued to recover deposits made with United States banks by Cuban banks that had been nationalized. 658 F.2d at 904. The Second Circuit considered whether recognition of the nationalization of the Cuban banks would be consistent with United States law and policy. Id. at 908-09. While acknowledging the line of cases beginning with

22

Republic of Iraq, the court found that recognizing the nationalization decree would further United State policy "because it [would] assist in providing funds in the United States from which American nationals who have valid claims against the government of Cuba may be compensated." Id. at 909. That is, any funds awarded to Banco Nacional would be frozen and available to judgment creditors of Cuba. Id. Furthermore, the former owners had not asserted any claims to recover their property in the twenty years that the action had been pending, either by intervening in the proceedings or bringing suit. Id.

Chemical Bank is distinguishable. First, while Plaintiffs correctly identify one of the policies of the TRIA—the compensation of victims of terrorism—they ignore the other policies of that statute, punishing and deterring terrorist states. The United States has filed a Statement of Interest, which expresses the view that giving extraterritorial effect to Trans-Cuba's nationalization would be contrary to United States policy. U.S. State. of Interest at 19. The Executive's views in the context of foreign policy are entitled to deference because "blocked assets play an important role in the conduct of United States foreign policy." Rubin v. Islamic Republic of Iran, 709 F.3d 49, 57 (1st Cir. 2013); see also Estate of Heiser, 885 F. Supp. 2d at 441. As the United States argues, "[a]llowing some plaintiffs to attach blocked assets that are not owned by the sanctions target (in this case, Cuba) would selectively drain the pool of blocked assets, thereby reducing the leverage that these assets provide." U.S. State. of Interest at 10-11. The United States further argues that permitting "attachment of blocked assets that the terrorist party does not own would effectively subsidize terrorist states by allowing plaintiffs to satisfy a judgment from assets owned by innocent third parties." Id. at 11. Thus, while giving extraterritorial effect to Trans-Cuba's nationalization would further the policy of compensating victims of terrorism, it would undermine the policies of

punishing and deterring Cuba by allowing it to satisfy its debts with property that it does not own.

See Villoldo v. Ruz, No. 13-mc-94014, 2015 WL 4092694, at *5 (D. Mass. July 7, 2015)

("Therefore, for the Court to give effect to Cuban Law Nos. 567 and 568, enforcement of the

expropriation must further the policy of compensating victims *with assets owned by Cuba*. But the

[blocked] accounts are only owned by Cuba if the Court gives effect to Cuban Law Nos. 567 and

568. The Court refuses to adopt such a circular justification . . . .").

Second, unlike Chemical Bank, Trans-Cuba's shareholders did bring a suit to recover their

property. Honey Mann resulted in the award of Trans-Cuba's New York accounts to specific

shareholders. Duvall Aff. ¶ 13. Shareholders continue to file claims seeking funds held in their

names. Id. ¶ 29. Thus, the policy interest articulated by the United States against compensating the

victims of terrorism with the assets of other victims is especially relevant here. The Court is

persuaded by the United States' arguments and agrees that giving Trans-Cuba's nationalization

effect as to the New York accounts would not be consistent with United States policy.

Finally, Plaintiffs argue that the TRIA preempts any preclusive effect of Honey Mann on this

action. Pls. Reply – First and Second Pets. at 23-28. However, the TRIA would only apply if the

assets at issue were either owned by Cuba or an agency or instrumentality of Cuba. As the Court

has explained, Plaintiffs have not shown that the Trans-Cuba accounts are the property of Cuba.

Having considered each of Plaintiffs' objections, the Court finds that Honey Mann

establishes that the Trans-Cuba accounts are not the property of Cuba. Accordingly, Plaintiffs'

Petition to turnover the Trans-Cuba accounts must be denied.

## C. Cuban Entities Petition

Plaintiffs petition for the turnover of two accounts belonging to Banco Nacional and fifty-

eight accounts (the "Entity Accounts") belonging to other Cuban corporations, all of which are

blocked pursuant to the CACR. Cuban Entities Pet.[12] Plaintiffs assert that these Accounts are the

property of Cuba and are subject to turnover under the FSIA and the TRIA because Banco Nacional

is the central bank of Cuba and the remaining Cuban corporations have been nationalized and are

wholly owned by the Cuban government. Id. at 2; see also Salazar-Carrillo Aff. ¶¶ 7-8; 13-14. As

with Plaintiffs' Trans-Cuba Petition, the Comptroller opposes Plaintiffs' Cuban Entities Petition on

the ground that Plaintiffs have not demonstrated that the Cuban entities, other than Banco Nacional,

are agencies or instrumentalities of Cuba, or that any of the Accounts are the property of Cuba.

Comp. Resp. – First and Second Pets. at 13-14, 22-24.

### 1. Entity Accounts

The Court first notes that Plaintiffs have requested that the Court defer ruling on the Entity

Accounts, other than the two Banco Nacional accounts, until Plaintiffs have gathered additional

evidence and supplemented their Petition. Pls. Reply – First and Second Pets. at 28-29. Plaintiffs'

request is in response to the Comptroller's objection that "Plaintiffs have not . . . demonstrate[d]

that any entities whose assets they seek to attach are in fact incorporated in Cuba or otherwise

formed under Cuban law." Comp. Resp. – First and Second Pets. at 13.

Under the FSIA, an entity is not an agency or instrumentality of a foreign state if it is a

citizen of the United States or created under the laws of a third country. 28 U.S.C. § 1603(b)(3).

While Plaintiffs assert that the Cuban entities have been nationalized and are therefore wholly

owned by the Cuban government, Cuban Entities Pet. at 2, they do not offer any evidence that the

---

[12] Plaintiffs filed the OFAC report of the Entity Accounts with the Court under seal. Dkt. Nos. 17-1 ("Exhibit A, Banco Nacional Accounts"); 17-2 ("Exhibit B, Cuban Corporation Accounts").

entities are "incorporated in Cuba or otherwise formed under Cuban law," Comp. Resp. – First and Second Pets. at 13. As the Comptroller argues, certain of the entities do not appear to be Cuban entities. Comp. Resp. – First and Second Pets. at 13-14 (citing examples of corporations that appear to be non-Cuban). Plaintiffs acknowledge the Comptroller's objection and therefore request that the Court defer ruling on their Cuban Entities Petition while they gather additional evidence to supplement the Petition. Pls. Reply – First and Second Pets. at 28-29.

Because the Court finds below that additional briefing is required on Plaintiffs' Escheated Accounts Petition, the Court will defer ruling on Plaintiffs' Cuban Entities Petition. Plaintiffs may supplement the Petition with any additional evidence they gather within forty-five (45) days of this Memorandum-Decision and Order. Plaintiffs may then renew their Petition to turnover the Entity Accounts.

However, before deferring ruling on Plaintiffs' Cuban Entities Petition, the Court must address the Comptroller's arguments that Plaintiffs have also failed to demonstrate that Cuba owns the assets in question. Comp. Resp. – First and Second Pets. at 22-24; Comp. Surreply at 6-7. The Comptroller argues that it would be futile to allow Plaintiffs to supplement their Petition as to whether the Entities are agencies or instrumentalities because Plaintiffs have also failed to meet their burden of showing Cuban ownership of the Entity Accounts. Comp. Surreply at 6-7. First, the Comptroller argues that Plaintiffs' reliance on the OFAC report as showing Cuban ownership of the Accounts is misplaced, because the OFAC report does not evidence ownership and merely identifies accounts blocked pursuant to the CACR. Comp. Resp. – First and Second Pets. at 22-23. Second, the Comptroller argues that the nationalization decrees upon which Plaintiffs assert Cuban ownership of the Entity Accounts are not entitled to recognition under the extraterritorial exception.

Id. at 23-24.  The Court addresses the Comptroller's arguments in turn.

The Comptroller asserts that the OFAC report cannot be used to establish ownership because the account holder information it contains "simply reflects what the organizations that reported the funds to the Comptroller reported as the 'owner' of the assets for administrative purposes."  Id. at 22-23; see also Dkt. No. 27-9 (United States Statement of Interest, Rux v. ABN Amro Bank N.V., No. 08 Civ. 6588 (S.D.N.Y. Nov. 21, 2008) ("Rux Statement of Interest")) at 8 ("OFAC understands that the information in the 'owner' field does not evidence actual ownership of the funds at issue, but rather generally is used by holders of blocked assets (i.e., reporting financial institutions) for their own clerical purposes . . .").  However, Plaintiffs' argument for Cuban ownership of the Entity Accounts in fact is based on state law, not the OFAC report.  Pls. Resp. – U.S. State. of Interest at 3-5.

Neither the FSIA nor the TRIA define how "ownership" is to be determined.  Calderon-Cardona v. Bank of N.Y. Mellon, 770 F.3d 993, 1001 (2d Cir. 2014); Hausler v. JP Morgan Chase Bank, N.A., 770 F.3d 207, 211 (2d Cir. 2014).  "When Congress has not created any new property rights, but 'merely attaches consequences, federally defined, to rights created under state law,' [courts] must look to state law to define the 'rights the [judgment debtor] has in the property the [creditor] seeks to reach.'"  Calderon-Cardona, 770 F.3d at 1001 (quoting Export-Import Bank of U.S. v. Asia Pulp & Paper Co., 609 F.3d 111, 117 (2d Cir. 2010)).  All parties agree that the Court should look to state law to determine ownership.  Comp. Resp. – First and Second Pets. at 18; Pls. Resp. – U.S. State. of Interest at 3-4; see also U.S. State. of Interest at 12-15 (arguing, without taking position, that the Court should conduct choice of law analysis).

The Comptroller argues that under the New York Abandoned Property Law, the Comptroller

has "full and complete authority to determine" any claims to abandoned property. Comp. Resp. –
First and Second Pets. at 19 (quoting N.Y. ABAND. PROP. § 1406(b)). "The Comptroller . . . is
empowered to take testimony and proofs, under oath, . . . and shall have power to subpoena and
require the attendance of witnesses and the production of books, papers and documents pertinent to
such hearings." N.Y. ABAND. PROP. § 1406(c). While it is undisputed that the Entity Accounts are
subject to the Abandoned Property Law, the Comptroller's authority to adjudicate ownership claims
under that statute is not dispositive of Plaintiffs' N.Y. C.P.L.R. § 5225(b) turnover petition. The
Abandoned Property Law does not provide a substantive rule for determining whether the Entity
Accounts are the property of Cuba; it provides that the Comptroller has "authority" to determine any
claims to abandoned property but does not specify how ownership is to be determined.

    Plaintiffs, on the other hand, assert that under New York law "an account is presumed to be
the property of the entity in whose name it is held." Pls. Resp. – U.S. State. of Interest at 3 (citing
EM Ltd. v. Republic of Argentina, 473 F.3d 463, 473-74 (2d Cir. 2007)). The Court agrees that the
presumption identified by Plaintiffs is applicable to the ownership of the Entity Accounts. "Under
New York law, the party who possesses property is presumed to be the party who owns it . . . .
When a party holds funds in a bank account, possession is established, and the presumption of
ownership follows." Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi
Negara [Pertamina], 313 F.3d 70, 86 (2d Cir. 2002) (citing Perkins v. Guaranty Trust Co. of New
York, 8 N.E.2d 849 (N.Y. 1937); Kolodziejczyk v. Wing, 689 N.Y.S.2d 825, 825 (App. Div. 1999))
(citation omitted). Applied to the Entity Accounts, there is a presumption that the Accounts are the
property of the account holders. While that presumption may be rebutted, Pertamina, 313 F.3d at
86, the Comptroller does not argue that any entities other than the account holders are the owners of

the Accounts. Thus, the Court agrees with Plaintiffs that, under State law, the Entity Accounts are owned by the account holders.

The Comptroller next argues that even if Plaintiffs establish that the Entity Accounts are owned by the account holders, the Accounts are not the property of Cuba because the nationalization decrees are not entitled to enforcement with respect to property within the United States. Comp. Resp. – First and Second Pets. at 23-24.

The law discussed above by the Court in its analysis of Plaintiffs' Trans-Cuba Petition is applicable. The act of state doctrine forbids courts from examining "the validity of a taking of property within its own territory by a foreign sovereign government." Sabbatino, 376 U.S. at 428. However, "when property confiscated is within the United States at the time of the attempted confiscation, our courts will give effect to acts of state only if they are consistent with the policy and law of the United States." Cosmic Int'l, 542 F.2d at 873.

Any claim to Cuban ownership of the Entity Accounts—which it is undisputed were located in New York—based on the nationalization of the account holder corporations, falls within the extraterritorial exception to the act of state doctrine. "Extra-territorial enforcement of [a nationalization decree] as to property within the United States at the date of its promulgation turns on whether the decree is consistent with our policy and laws." Republic of Iraq, 353 F.2d at 51. Furthermore, the law is settled that a foreign state cannot indirectly confiscate property within the United States. See Maltina Corp. v. Cawy Bottling Co., 462 F.2d 1021, 1027 (5th Cir. 1972) ("[F]ederal courts are to take a pragmatic view of what constitutes an extraterritorial action by a foreign state."). Thus, Plaintiffs cannot establish through the act of state doctrine that Cuba owns the Entity accounts indirectly by virtue of the nationalization of those corporations.

Plaintiffs must therefore show that it would be consistent with United States law and policy to enforce the Cuban nationalization decrees as to the Entity Accounts. The Court discussed the relevant policy interests—compensation of victims and the punishment and deterrence of terrorist states—above, in connection with Plaintiffs' Trans-Cuba Petition. However, unlike the Trans-Cuba Accounts, none of the shareholders of these nationalized entities have brought actions to recover the Entity Accounts. Thus, the facts are similar to <u>Chemical Bank</u> and the balance of policy interests which the Court found weighed against recognizing Trans-Cuba's nationalization is not dispositive as to the Entity Accounts. However, the parties have not briefed whether the recognition of the Cuban nationalization decrees as to the Entity Accounts would be consistent with United States policy. In light of Plaintiffs' request to conduct additional discovery as to the Entity Accounts, the Court will not decide at this time whether it would be consistent with United States policy to enforce the Cuban nationalization decrees as to the Entity Accounts. The parties are instructed to submit additional briefing on this issue at such time when Plaintiffs renew their Petition to turnover the Entity Accounts.

### 2. *Banco Nacional Accounts*

While the Court defers ruling on the Entity Accounts, the Court finds that Plaintiffs have met their burden of demonstrating that the two Banco Nacional accounts are subject to turnover at this time. Numerous courts have recognized that Banco Nacional is the central bank of Cuba and wholly owned by the Cuban government. <u>Dean Witter Reynolds, Inc. v. Fernandez</u>, 741 F.2d 355, 357 (11th Cir. 1984) ("Banco Nacional . . . [is a] wholly owned corporation[] of the Government of Cuba."); <u>Chemical Bank</u>, 658 F.2d at 905 ("Banco Nacional is the central bank of Cuba."); <u>Weininger</u>, 462 F. Supp. 2d at 498 ("Banco Nacional is apparently the central bank of [Cuba] . . .

and is an agency or instrumentality."). The Comptroller does not dispute that Banco Nacional is the central bank of Cuba and wholly owned by the Cuban government. See Comp. Resp. – First and Second Pets. at 13. Accordingly, the Court finds that Plaintiffs have established that Banco Nacional is an agency or instrumentality of Cuba under the FSIA. See S&S Mach. Co. v. Masinexportimport, 706 F.2d 411, 414 (2d Cir. 1983) ("State-owned central banks indisputably are included in the § 1603(b) definition of 'agency or instrumentality.'"). Plaintiffs next argue that Banco Nacional is the presumed owner of the two accounts under New York law because the accounts are held in its name. Pls. Reply – First and Second Pets. at 3-5. The Court agrees. As discussed above, under New York law, a bank account holder is the presumed owner of the account. See Pertamina, 313 F.3d at 86. The Comptroller has not presented any evidence or arguments to rebut the presumption that Banco Nacional is the owner of these accounts. Accordingly, the Court finds that Plaintiffs have established that the two Banco Nacional accounts are the property of Cuba. Because Plaintiffs have established that Banco Nacional is an agency or instrumentality of Cuba and that the two Banco Nacional accounts are owned by Banco Nacional, the Banco Nacional accounts are subject to turnover under § 1610(b)(3) of the FSIA and TRIA § 201.

Although the Banco Nacional accounts are the property of Cuba and subject to turnover, the Comptroller shall not turnover the accounts until Plaintiffs have provided notice to interested third parties of the order to turnover the accounts and such third parties have had the opportunity to appear and object to the turnover of the accounts. Other judgment holders have served the Comptroller with writs of execution against these accounts. See Martinez v. Republic of Cuba, 1:14-cv-0856 (N.D.N.Y. filed July 11, 2014), Dkt. No. 26-2 (letter from Comptroller stating that blocked assets are subject to writs of executions in several pending actions). Plaintiffs shall provide

notice of the order to turnover the Banco Nacional Accounts within fifteen (15) days of this

Memorandum-Decision and Order.  Any interested third parties shall have thirty (30) days from the

date of such notice to appear and file objections to the turnover of the Banco Nacional accounts to

Plaintiffs.  Upon the filing of objections, the Court shall determine the priority of claims to the

Banco Nacional accounts.  If no parties file objections, the Comptroller shall turnover the Banco

Nacional accounts to Plaintiffs.

### D.  Escheated Accounts Petition

Plaintiffs petition for the turnover of 260 accounts ("Escheated Accounts") which allegedly

belonged to Cuban nationals and have escheated to Cuba by virtue of its abandonment and

inheritance laws.[13]  Escheated Accounts Pet.; Pls. Reply – Escheated Accounts at 2.  The Escheated

Accounts were held at various financial and non-financial institutions located in New York.

Escheated Accounts Pet. at 3; Dkt. No. 39-1 ("Duvall Escheated Accounts Affidavit") ¶ 12.  The

Escheated Accounts were transferred, pursuant to a license issued by OFAC, to the Comptroller as

---

[13] Plaintiffs filed the OFAC report of the Escheated Accounts with the Court under seal. Dkt. No. 21-1.  On October 7, 2014, Plaintiffs filed a Letter Motion requesting additional discovery regarding the individual account holders, prior to filing their Reply to the Comptroller's Response. Dkt. No. 43.  On November 7, 2014, the Court granted that request.  Dkt. No. 54.  Plaintiffs subpoenaed all thirty-two financial institutions that transferred the Escheated Accounts to the Comptroller.  Dkt. No. 55 ("Plaintiffs Reply – Escheated Accounts") at 2.  With the additional documents obtained, Plaintiffs filed four exhibits with the Court under seal.  Dkt. Nos. 55-1 ("Escheated Accounts Exhibit A"); 55-2 ("Escheated Accounts Exhibit B"); 55-3 ("Escheated Accounts Exhibit C"); 55-4 ("Escheated Accounts Exhibit D"); 56.  Exhibit A lists and contains supporting documentation for those individuals that Plaintiffs confirmed were Cuban citizens; exhibit B lists and contains documentation for those individuals whom Plaintiffs confirmed resided in Cuba through the 1958 Cuban telephone book; exhibit C lists and contains supporting documentation for those individuals whom Plaintiffs identified as living in Cuba but were unable to find in the 1958 Cuban telephone book; and exhibit D lists those individuals for whom Plaintiffs were unable to find any additional information.  Pls. Reply – Escheated Accounts at 2.

custodian under New York's Abandoned Property Law. Escheated Accounts Pet. at 3.

Plaintiffs allege that the Escheated Accounts are the property of Cuba pursuant to Articles 195 and 546 of the Cuban Civil Code.[14] Id. at 4-6. Plaintiffs' Escheated Accounts Petition requires

---

[14] Article 195 provides that

1. Money, jewelry or other valuable objects hidden in the land, sea or in other places and whose lawful property is not recorded, shall be the property of the State.

2. The goods referred to in the proceeding paragraph shall be delivered by whosoever found them to a banking institution of the town.

3. Whosoever found them shall be rewarded in an amount reaching the twenty fifth per cent of the value of said goods.

4. The reward referred to in the preceding paragraph shall not be paid to the individual who found the goods fulfilling the obligations inherent to his work position.

Dkt. No. 39-7 ("Cuban Civil Code"), Art. 195. Plaintiffs' expert, Professor Salazar-Carrillo, explained that this provision "is interpreted to mean that property abandoned by Cuban nationals becomes property of the Republic of Cuba." Dkt. No. 21-2 ("Salazar-Carrillo Escheated Accounts Affidavit") ¶ 8.

Article 546 provides that

1. The goods or rights of the legacy shall be transferred directly to the State, without the need to state an heir to its favor, in the following cases:

a) Should the testator have testated in favor of the State;

b) Should there not be any legal or testamentary heirs;

c) Should all the heirs be unqualified to inherit; the right of representation in the applicable cases excepted; and

d) Should all the heirs waive the legacy.

2. Should any co-heir waive the legacy in favor of the State or should there be the case of assumption provided for under paragraph 1 of article 473, it shall solely be transferred to the State the portion corresponding to the individual who waives the

a choice of law analysis and raises possible questions as to the interpretation of certain Cuban laws. Upon review of the record and parties' briefs, the Court finds that it is unable to resolve these issues on the present record and therefore stays Plaintiffs' Petition to allow further development of the record and briefing. The Court's discussion of the issues follows.

*1. Choice of Law*

As discussed above, neither the FSIA nor the TRIA define how "ownership" is to be determined. Calderon-Cardona, 770 F.3d at 1001; Hausler, 770 F.3d at 211. Accordingly, courts apply state law, see Calderon-Cardona, 770 F.3d at 1001, or if necessary, state choice of law rules, Pertamina, 313 F.3d at 84; Barkanic v. Gen. Admin. of Civil Aviation of the People's Republic of China, 923 F.2d 957, 961 (2d Cir. 1991). Because Plaintiffs assert Cuban ownership of the Escheated Accounts under Cuban laws 195 and 546, the Court must conduct a choice of law analysis.

Plaintiffs rely on Pertamina in order to establish that Cuba owns the Escheated Accounts. Pls. Resp. – U.S. State. of Interest at 5-6. In Pertamina, a judgment creditor sought to attach the New York bank accounts of Pertamina, "an oil and gas company owned and controlled by the

---

legacy or to whosoever definitively abandoned the country.

3. Moreover, it shall be transferred to the State the remaining portion of the goods, rights and actions of the legacy, should the testator have solely disposed of part of them and should there not be any heirs called by law.

Cuban Civil Code, Art. 546. Professor Salazar-Carrillo states that "[i]f property of a Cuban citizen were found outside Cuba after the Cuban citizen died and no one appeared to claim the property, Article 546 would operate to transfer title to the property to the Republic of Cuba." Salazar-Carrillo Escheated Accounts Aff. ¶ 13. Professor Salazar-Carrillo further stated that both Articles 195 and 546 "remain valid laws of Cuba, have not been repealed or superseded in any way, and continue to govern the rights and obligations of Cuban citizens." Id. ¶ 15.

Republic of Indonesia." 313 F.3d at 75. The bank accounts contained funds from the sale of

liquified natural gas extracted in Indonesia. Id. at 78. Pertamina and the Republic of Indonesia

argued that the funds were the property of Indonesia under Indonesian law and therefore were

immune from attachment under the FSIA. Id. at 75. The issue for the Second Circuit therefore was

whether the accounts were owned by Indonesia or Pertamina. Id. at 84.

The Second Circuit applied New York choice of law rules to determine what law governed

the question of ownership. Id. at 84-85. Under New York law, "[t]he first step in any case

presenting a potential choice of law issue is to determine whether there is an actual conflict between

the laws of the jurisdictions involved." In re Allstate Ins. Co., 613 N.E.2d 936, 937 (N.Y. 1993). If

the laws conflict, New York courts conduct an "interests analysis," in which "the law of the

jurisdiction having the greatest interest in the litigation [is] applied and . . . the facts or contacts

which obtain significance in defining State interests are those which relate to the purpose of the

particular law in conflict." Pertamina, 313 F.3d at 85 (quoting Koreag, Controle et Revision S.A. v.

Refco F/X Assocs., 961 F.2d 341, 350 (2d Cir. 1992)).

The Second Circuit concluded that there was no actual conflict between Indonesian and New

York law because New York law directed the court to apply Indonesian law. Id. at 86. To

determine ownership of funds, the Second Circuit began with the presumption under New York law

that a party who possesses property is the owner of that property. Id. Thus, the presumed owner of

the funds was Pertamina. Id. However, the presumption of ownership could be rebutted by

evidence that other parties have property rights in the disputed funds. Id. ("It [wa]s clear . . . that

this presumption [could] be rebutted by evidence that the Republic of Indonesia actually controlled

the disputed funds, or that Pertamina merely held the funds for the Republic of Indonesia, in the

manner of a trustee."). "Under New York law, then, the property rights are determined by the underlying relationship between Pertamina and the Republic of Indonesia." Id. The relationship between Pertamina and the Republic of Indonesia was governed by Indonesian law:

> [The judgement creditor] urges us to apply New York law to this relationship, and thus, to the property rights in the disputed funds. Yet [the judgment creditor] has not pointed to any New York cases or statutes that purport to govern this kind of arrangement. The Republic of Indonesia is a foreign state, and Pertamina is a corporate entity of Indonesia, created by legislative enactments and executive orders of the Republic of Indonesia. The relationship was created neither by contract nor by any other mechanism familiar to the laws of New York. It was established instead by provisions of Indonesian law uniquely applicable to the relationship itself . . . Under New York law, the meaning of these . . . provisions of Indonesian law determines the property rights of the parties. There is thus no actual conflict between the laws of New York and the laws of Indonesia.

Id. at 86-87.

Plaintiffs argue that Pertamina applies to the Escheated Accounts because "Cuba has specific laws governing its relationship with its citizens and the ownership of property that has passed either through inheritance or abandonment." Pls. Resp. – U.S. State. of Interest at 6. Because there is no New York law governing the property interests in the accounts between Cuba and its nationals, "New York law directs the Court to apply the specific Cuban laws affecting the property at issue." Id. The Court, subject to the discussion below regarding the interpretation of Articles 195 and 546, agrees.

The Comptroller has not identified any New York laws governing the relationship between Cuba and its nationals. See Dkt. No. 59-1, Villoldo v. Ruz, No. 13-mc-94014 (D. Mass. Jan. 8, 2015) (finding no conflict where there was no state law governing "the property interests in the accounts between Cuba and the Cuban nationals"). The Comptroller argues that the Escheated Accounts are subject to the New York Abandoned Property Law. Comp. Resp. – Escheated

Accounts Pet. at 13, 15-16.  As discussed above, the Abandoned Property Law grants the Comptroller "full and complete authority to determine" claims to property.  N.Y. ABAND. PROP. § 1406(1)(b).  The Comptroller holds abandoned property "for the benefit of those entitled to receive it" and the state is perpetually liable to satisfy claims to abandoned property.  Id. § 1404(1)(ii); see also Friar v. Vanguard Holding Corp., 509 N.Y.S.2d 374, 376 (App. Div. 1986).  Although it is undisputed that the Escheated Accounts are held by the Comptroller as abandoned property, the Abandoned Property Law does not provide a substantive rule of decision for determining the ownership of the Accounts.  Indeed, the Abandoned Property Law directs the Comptroller to hold abandoned property "for the benefit of those entitled to receive" it, but does not provide a rule for how the rightful owner is to be determined.  See N.Y. ABAND. PROP. § 1406(1)(c) ("The comptroller . . . is empowered to take testimony and proofs, under oath . . .").  Thus, the only substantive laws that define the property interests of Cuba and its nationals in the Escheated Accounts are Articles 195 and 546.  As in Pertamina, the Court may look to these laws to rebut the presumption that the Escheated Accounts are owned by the account holders.  Accordingly, there is no conflict of law: New York law directs the Court to apply Cuban law as the only law governing the relationship between Cuba and its nationals.

 *2.  Cuban Laws*

Despite the above analysis, the Court cannot presently decide whether the Escheated Accounts are the property of Cuba on account of a number of questions raised by the Comptroller as to the applicability of Articles 195 and 546.

The Comptroller first argues that Article 195 has no effect because the Cuban Civil Code was not enacted until 1985 which is after the Escheated Accounts were abandoned.  Comp. Resp. –

37

Escheated Accounts Pet. at 13.  Article 7 of the Cuban Civil Code provides that "[t]he civil laws shall not have a retroactive effect, unless otherwise set forth by them due to social interest reasons or public usefulness."  Cuban Civil Code, Art. 7.  As the Comptroller points out, there is no indication in the text of Article 195 that it was intended to have retroactive effect.  Comp. Resp. – Escheated Accounts Pet. at 14.  The Comptroller further argues that Article 195 does not apply because the Escheated Accounts do not contain assets that were lost in Cuba.  See id. at 14-15; see also U.S. State. of Interest at 16-17.

The Comptroller's objections are well-placed.  In response to the Comptroller's retroactivity argument, Plaintiffs argue that they are applying current Cuban law and that "if this matter was pending in a Cuban court, the applicable law to determine whether title to the property transferred to Cuba would be the law in place today."  Pls. Reply – Escheated Accounts at 7.  However, Plaintiffs' assertion is unsupported by any citation.  Similarly, the Court cannot determine upon the current record whether the Escheated Accounts are lost property within the meaning of Article 195.  Article 195 applies to "found property" which is "not recorded."  Cuban Civil Code, Art. 195.  Professor Salazar-Carrillo states that "[i]n practice, [Article 195] is interpreted to mean that property abandoned by Cuban nationals becomes property of the Republic of Cuba."  Salazar-Carrillo Escheated Accounts Aff. ¶ 8.  This conclusory statement does not resolve the questions raised by the Comptroller as to the interpretation of Article 195.  The Court cannot determine whether the Escheated Accounts are indeed "found property" which is "not recorded."  The fact that each account has an account holder suggests that the accounts are recorded.  See U.S. State. of Interest at 16-17.  It is also uncertain whether the Escheated Accounts are "found property."

The parties additionally dispute the applicability of Article 546 to the Escheated Accounts.

Comp. Resp. – Escheated Accounts at 17-18; Pls. Reply – Escheated Accounts at 7; U.S. State. of Interest at 17. The Comptroller argues that Plaintiffs have provided no evidence that "any of the holders of the [Escheated Accounts] died intestate with no identifiable heirs." Comp. Resp. – Escheated Accounts at 17. Because all of the Escheated Accounts are abandoned and thus may be the property of Cuba under Article 195, the Court will reserve judgment on whether certain of the Escheated Accounts might also escheat to Cuba under Article 546.

Thus, Plaintiffs' Escheated Accounts Petition is stayed. The parties are directed to develop the record and submit additional briefing on the applicability of Article 195 to the Escheated Accounts. Plaintiffs shall submit additional briefing within forty-five (45) days of this Memorandum-Decision and Order. The Comptroller shall have thirty (30) days to respond and Plaintiffs shall have ten (10) days to file a reply. The Court requests that the parties' additional briefing and evidence pay specific attention to the following issues:

(1) Whether the Escheated Accounts are property which is subject to Article 195; and

(2) Whether Article 195 may be applied retroactively.

## V.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Plaintiffs' Motion (Dkt. No. 6) for entry of a 28 U.S.C. § 1610(c) order is **GRANTED**; and it is further

**ORDERED**, that Plaintiffs' Petition (Dkt. No. 7) to turnover the Trans-Cuba Accounts is **DENIED**; and it is further

**ORDERED**, that Plaintiffs' Petition (Dkt. No. 17) to turnover the Cuban Entity Accounts is **GRANTED** as to the Banco Nacional Accounts and **STAYED** as to all other Entity Accounts; and

it is further

**ORDERED**, that Plaintiffs may supplement their Petition (Dkt. No. 17) to turnover the Cuban Entity Accounts within **forty-five (45) days** of the filing date of this Memorandum-Decision and Order.  The Comptroller shall then have **thirty (30) days** to file a response and Plaintiffs shall have **ten (10) days** to file a reply; and it is further

**ORDERED**, that Plaintiffs shall provide notice of the order to turnover the Banco Nacional accounts to interested third parties within **fifteen (15) days** of the filing date of this Memorandum-Decision and Order.  Any interested third parties shall have **thirty (30) days** from the date of such notice to appear and file objections to the turnover of the Banco Nacional accounts to Plaintiffs. Upon the filing of objections, the Court shall determine the priority of claims to the Banco Nacional accounts.  If no third parties appear and file objections at the end of the **thirty (30) day** notice period, the Comptroller shall turnover the Banco Nacional accounts to Plaintiffs; and it is further

**ORDERED**, that Plaintiffs' Petition (Dkt. No. 21) to turnover the Cuban Escheated Accounts is **STAYED**; and it is further

**ORDERED**, that the parties submit additional evidence and briefing as to Plaintiffs' Petition (Dkt. No. 21) to turnover the Cuban Escheated Accounts consistent with this Memorandum-Decision and Order.  Plaintiffs shall submit additional briefing within **forty-five (45) days** of the filing date of this Memorandum-Decision and Order.  The Comptroller shall then file a response within **thirty (30) days** and Plaintiffs shall file a reply within **ten (10) days**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

40

**IT IS SO ORDERED.**

DATED:      January 07, 2016
               Albany, NY

Lawrence E. Kahn
U.S. District Judge