UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ALFREDO VOLLOLDO, *et al.*,

                Plaintiffs,

-against-                            1:14-MC-25 (LEK/CFH)

FIDEL CASTRO RUZ, *et al.*,

                Defendants.

---

ALFREDO VOLLOLDO, *et al.*,

                  Plaintiffs/Petitioners,
-against-

THOMAS P. DiNAPOLI, New York
State Comptroller,

                Respondent.

---

**MEMORANDUM-DECISION AND ORDER**

**I.    INTRODUCTION**

Plaintiffs Alfredo Volloldo and Gustavo F. Villoldo commenced this action to enforce a Florida state court default judgment against the Republic of Cuba and various Cuban government entities and officials in May 2014. Dkt. Nos. 1 ("Registration of Foreign Judgment"), 6 ("1610(c) Motion"). On January 7, 2016, the Court granted Plaintiffs' 1610(c) Motion and granted, but stayed, Plaintiffs' petition for an order directing Thomas P. DiNapoli, the New York State Comptroller, to turnover assets located in the Northern District that the Comptroller holds as custodian of abandoned property. Dkt. No. 66 ("2016 Order"). Presently before the Court are Plaintiff's request for a final turnover order, Dkt. No. 127 ("Turnover Motion"), and the

Comptroller's motion to dismiss for lack of subject matter jurisdiction, Dkt. No. 135 ("Comptroller's Motion"). For the reasons stated below, the Comptroller's Motion is granted, and the Turnover Motion is denied.

## II. BACKGROUND

### A. Factual Background

The facts underlying this action were detailed in the 2016 Order and will be repeated here only to the extent necessary to resolve the motions currently before the Court. The following facts are drawn from the Florida state court's findings of fact. Dkt. No. 6-8 ("Florida Judgment").

Plaintiffs are the sons of Gustavo Villoldo Argilagos, a dual citizen of the United States and Cuba. Id. at 2. Before the Cuban Revolution in January 1959, Villoldo Argilagos was a successful businessman in Cuba and owned several businesses, including one of the first General Motors dealerships in Cuba, and held numerous pieces of real estate. Id. at 3. After the Revolution, Villoldo Argilagos and his family were targeted by Defendants on account of Villoldo Argilagos's wealth and American citizenship. Id. at 3–4. Villoldo Argilagos and his sons were imprisoned, beaten, and threatened with execution. Id. at 4–5. On several occasions, Villoldo Argilagos was removed from his home at gunpoint. Id. at 5. He was told repeatedly that his family would be killed unless he surrendered his property and took his own life. Id. On February 16, 1959, Villoldo Argilagos's body was found in his home, the result of an apparent suicide. Id. Plaintiffs fled Cuba and have resided in the United States since 1960. Id. at 2. Defendants have continued to pursue efforts to assassinate Plaintiffs and have threatened Plaintiffs with assassination as recently as 2003. Id. at 5.

**B. Procedural History**

Plaintiffs initially sued Defendants in the Eleventh Judicial Circuit Court in and for Miami-Dade County, Florida for personal injury and wrongful death. 1610(c) Mot. Defendants were served with process in the Florida action, but failed to appear. Florida Judgment at 2. On August 19, 2011, following a non-jury trial, the Florida state court found that Defendants were liable under the Foreign Sovereign Immunities Act's ("FSIA") terrorism exception, 28 U.S.C. § 1605A, for acts of torture committed against Plaintiffs. Id. at 6. The court entered a default judgment against Defendants and awarded Plaintiffs $2.79 billion, including $1 billion in punitive damages. Id. at 7–8.

On October 25, 2012, the United States District Court for the Southern District of New York extended full faith and credit to the Florida Judgment. Registration of Foreign Judgment. Plaintiffs commenced this action on May 15, 2014 by registering the Southern District judgment in this Court. Id. Plaintiffs subsequently filed a Motion for entry of a 28 U.S.C. § 1610(c) order, 1610(c) Mot., and several petitions to turnover various blocked assets held by the Comptroller, Dkt. Nos. 7 ("Trans-Cuba Petition"), 17 ("Cuban Entities Petition"), 21 ("Escheated Accounts Petition"). The Court issued a writ of execution on July 24, 2014, Dkt. No. 20 ("Writ of Execution"), which it stayed pending further order, Dkt. No. 23.

In the 2016 Order, the Court granted Plaintiffs' Cuban Entities Petition with respect to certain Banco Nacional de Cuba accounts, denied the Trans-Cuba Petition, and stayed the Escheated Accounts Petition. 2016 Order at 39–40. The Court further ordered Plaintiffs to notify interested third parties of the order to turnover the Banco Nacional accounts to allow objections from any individuals who might have a claim to the accounts. Id. at 40. On December 2, 2016,

Plaintiffs informed the Court that they had complied with the 2016 Order and that there were "no pending objections to turnover of the Banco Nacional accounts to the Plaintiffs." Turnover Mot. at 2.

### C. The Pending Motions

Plaintiffs argue that they are entitled to the Banco Nacional accounts pursuant to the 2016 Order and seek an order directing the Comptroller to turnover any funds in the accounts to Plaintiffs. Id. The Comptroller opposes the Turnover Motion, and argues that the Court should vacate the Writ of Execution and dismiss this action for lack of subject matter jurisdiction. Dkt. No. 135-1 ("Memorandum"). Specifically, he argues that the Court lacks subject matter jurisdiction to enforce the Florida Judgment because the Florida court itself lacked jurisdiction. Id. at 5–17. Since no FSIA exception applied, the Comptroller argues, Defendants were immune from suit and the Florida Judgment is void. Id. at 5–7. Plaintiffs oppose the Comptroller's Motion, arguing that the Florida court properly concluded that the FSIA's "terrorism exception" abrogated Defendants' immunity, and, in any event, the Comptroller lacks standing to collaterally attack the Florida Judgment. Dkt. No. 138 ("Opposition") at 4–19.

## III. LEGAL STANDARD

A fundamental predicate to judgment in the federal courts is the existence of subject matter jurisdiction. "Dismissal of a case for lack of subject matter jurisdiction . . . is proper 'when the district court lacks the statutory or constitutional power to adjudicate it.'" Ford v. D.C. 37 Union Local 1549, 579 F.3d 187, 188 (2d Cir. 2009) (per curiam) (quoting Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)). A lack of subject matter jurisdiction cannot be waived, and may be raised by motion or sua sponte at any time. Transatlantic Marine Claims

Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 107–08 (2d Cir. 1997). "If [a] court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). The party asserting subject matter jurisdiction carries the burden of proving its existence by a preponderance of the evidence. E.g., Makarova, 201 F.3d at 113; Augienello v. FDIC, 310 F. Supp. 2d 582, 587–88 (S.D.N.Y. 2004).

IV. DISCUSSION

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989). Foreign states are immune from the jurisdiction of federal and state courts unless one of the exceptions contained in §§ 1605–1607 applies. § 1604. The "terrorism exception"—codified at § 1605A—"abrogates immunity for those foreign states officially designated as state sponsors of terrorism by the Department of State where the foreign state commits [torture] or provides material support for the commission of . . . [torture,] and the act results in the death or personal injury of a United States citizen." Weinstein v. Islamic Republic of Iran, 609 F.3d 43, 48 (2d Cir. 2010).[1] The claimant or victim must establish that he was a United States national, armed service member, or government employee or contractor at the time of the challenged act. § 1605A(2)(A)(ii). If "the act occurred in the foreign state against which the claim has been brought," the claimant must also "afford[] the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration." § 1605A(2)(A)(iii).

---

[1] Plaintiffs do not argue that any other exception under the FSIA applies to their action. Opp'n.

5

## A. Effect of the Florida Judgment

Plaintiffs make two threshold arguments that the Court must address before analyzing the question of subject matter jurisdiction. First, Plaintiffs argue that the Comptroller lacks standing to collaterally attack the Florida Judgment. Opp'n at 10–11. In a recent case that raised similar jurisdictional questions under the FSIA, the Court held that "a garnishee such as the Comptroller has standing to bring a collateral attack against a jurisdictionally defective default judgment." Martinez v. Republic of Cuba, 221 F. Supp. 3d 276, 282 (N.D.N.Y. 2016) (Kahn, J.) (citing Weininger v. Castro, 462 F. Supp. 2d 457, 473 (S.D.N.Y. 2006)). In any event, the Court has an free-standing duty to assess its jurisdiction independent of the Comptroller's Motion. Transatlantic Marine, 109 F.3d at 107–08; accord Fed. R. Civ. P. 12(h)(3). Therefore, Plaintiffs' argument that the Comptroller lacks standing to challenge the Florida Judgment is unavailing.

Plaintiffs also urge the Court to follow the Southern District's decision in Vera v. Republic of Cuba, 40 F. Supp. 3d 367, 376 (S.D.N.Y. 2014), to afford full faith and credit to the Florida Judgment. Opp'n at 8–10. The Full Faith and Credit Act provides that "judicial proceedings . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of [the] State [in which they took place]." 28 U.S.C. § 1738. Thus, "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984). However, "a judgment of a court in one State is conclusive upon the merits in a court in another State only if the court in the first State had power to pass on the merits—had jurisdiction, that is, to render the judgment." Underwriters Nat'l Assurance Co. v. N.C. Life & Acc. & Health Ins. Guar. Ass'n,

455 U.S. 691, 704 (1982) (quoting Durfee v. Duke, 375 U.S. 106, 110 (1963)). "Consequently, before a court is bound by the judgment rendered in another State, it may inquire into the jurisdictional basis of the foreign court's decree. If that court did not have jurisdiction over the subject matter or the relevant parties, full faith and credit need not be given." Id. at 705; see also Kremer v. Chem. Constr. Corp., 456 U.S. 461, 482 (1982) ("A State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and other state and federal courts are not required to accord full faith and credit to such a judgment." (footnote omitted)).

As a general rule, "a judgment is entitled to full faith and credit—even as to questions of jurisdiction—when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment." Underwriters, 455 U.S. at 706 (quoting Durfee, 375 U.S. at 111). However, "[d]efault judgments stand on different ground." Wiederspan v. Republic of Cuba, 246 F. Supp. 3d 873, 877 (S.D.N.Y. 2017). "[J]urisdictional determinations made in a default judgment are not entitled to res judicata effect if the defendant did not 'actually appear[ ]' in the proceedings." Vera v. Republic of Cuba, 867 F.3d 310, 317 (2d. Cir. 2017) (second alteration in original) (quoting Jerez v. Republic of Cuba, 775 F.3d 419, 422 (D.C. Cir. 2014)). Indeed, "the Full Faith and Credit Act, which requires state court judgments to receive the same credit, validity, and effect in every other court in the United States has no bearing on the question of whether a district court has subject matter jurisdiction to hear a claim." Id. at 320 (citing Minnesota v. N. Sec. Co., 194 U.S. 48, 72 (1904)). The Second Circuit has cautioned that "default judgments are disfavored, especially those against foreign sovereigns. Courts go to great lengths to avoid default judgments

7

against foreign sovereigns or to permit those judgments to be set aside." First Fidelity Bank, N.A. v. Gov't of Antigua & Barbuda-Permanent Mission, 877 F.2d 189, 196 (2d Cir. 1989).

Plaintiffs' reliance on Vera is misplaced. In Vera, several petitioners sought to enforce Florida state default judgments against Cuba and its agents in federal court. 40 F. Supp. 3d at 369. Plaintiffs were among the Vera petitioners and sought to enforce the Florida Judgment at issue here. Id. at 371–72. Citing the Full Faith and Credit Act, the court explained that it was required to enforce the Florida judgments "unless there [was] an obvious and grave jurisdictional defect apparent on the face of the . . . order[s]." Id. at 375. The Vera court concluded that it had subject matter jurisdiction over the action because the Florida court "properly found that it had subject matter jurisdiction over Cuba, pursuant to 28 U.S.C. § 1605(a)(7)." Id. at 377. In the 2016 Order, the Court noted that "[t]he Southern District of New York considered a collateral attack on the Florida Judgment and found that the Florida court's findings satisfied the criteria of § 1605A." 2016 Order at 12 (citing Vera, 40 F. Supp. 3d at 376). While the Court previously "decline[d] to independently examine the jurisdiction of the Florida Judgment," id., Plaintiffs now urge the Court to adopt the reasoning in Vera and affirm the Florida court's assessment of its jurisdiction, Opp'n at 8–10.

Unfortunately for Plaintiffs, the Second Circuit recently reversed Vera, holding that the FSIA's terrorism exception did not apply "because Cuba was not designated a state sponsor of terrorism at the time Vera's father was killed, and Vera failed to establish that Cuba was later designated a state sponsor of terrorism as a result of his father's death." Vera, 867 F.3d at 313.[2]

---

[2] While the district court in Vera concluded that the Florida Judgment was valid, 40 F. Supp. 3d at 377, the Second Circuit opinion involved a challenge to different Florida state judgment offered by a different plaintiff, 867 F.3d at 313–14. Though highly relevant to the

8

The Second Circuit concluded that the district court "erred doubly in relying on the Florida court's findings of fact as the basis for its jurisdiction: the Florida court did not make the findings necessary to render Cuba subject to suit under the terrorism exception of the FSIA and, even if it had, those findings would not bind or aid the District Court, which was required to analyze the record independently to determine if Cuba was immune." Id. at 318. "By failing to make that factual inquiry, the District Court did not fulfill its obligation to 'apply the detailed federal law standards set forth in the [FSIA]' in order to 'satisfy itself that one of the exceptions [to immunity] applies.'" Id. (alterations in original) (quoting Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 494 (1983)). Contrary to Plaintiffs' argument, Opp'n at 8–10, the Court cannot rely on the Florida court's findings of fact as the basis for its jurisdiction. Under Second Circuit's opinion in Vera, the Court must "analyze the record independently to determine if Cuba was immune." 867 F.3d at 318. Therefore, the Court rejects Plaintiffs' invitation to follow the Southern District's reasoning in Vera.

### B. Application of the FSIA

As noted above, the terrorism exception of the FSIA abrogates a foreign state's sovereign immunity where (1) "money damages are sought against a foreign state for personal injury or death that was caused by an act of torture [committed by the state or any of its employees or agents]" and (2) "the foreign state was designated as a state sponsor of terrorism at the time [of] the act . . . or was so designated as a result of such act." § 1605A. The Florida court concluded that the requirements of § 1605A were satisfied because "Defendants' conduct rose to such a

---

Court's analysis, the Second Circuit did not address whether the Florida Judgment at issue here is void.

level of depravity contemplated by [the] statute." Florida Judgment at 6. Specifically, the court held that Defendants' harassment, imprisonment, and beating of Villoldo Argilagos in January and February 1959, which "caused Mr. Villoldo to take his life [and] . . . caused the loss of the Villoldo property," constituted torture within the meaning of § 1605A. Id. The court further held that Defendants' "threats of assassination and assassination attempts" against Plaintiffs also qualified as torture. Id.

The Comptroller argues that Defendants' 1959 conduct cannot form the basis for a claim under the terrorism exception because Cuba was not designated a state sponsor of terrorism until 1982 and Villoldo Argilagos's plight, though shocking, was not the cause of Cuba's designation. Mem. at 4–8. He further asserts that the Florida court failed to conclude that Plaintiffs were United States nationals at the time of Defendants' 1959 misdeeds. Id. at 8–9. Finally, the Comptroller claims that the assassination threats, which occurred after Defendants were designated a sponsor of terrorism, are not factually substantiated and do not qualify as torture under § 1605A. Id. at 8–11.

Plaintiffs respond that the 1959 conduct does satisfy § 1605A because, they argue, Cuba was designated a state sponsor of terrorism in part because of its acts against Villoldo Argilagos. Opp'n at 4–6. They further argue that the post-1982 assassination attempts do qualify as torture, id. at 7, and that Plaintiffs were American citizens at birth, id. at 15–19.

### 1. Defendants' 1959 Acts

Cuba was designated as a state sponsor of terrorism in 1982. Weininger, 462 F. Supp. 2d at 479 (citing Clarification for Foreign Policy Export Controls, 47 Fed. Reg. 16,623 (Apr. 19, 1982)). Therefore, "[i]n order to invoke the terrorism exception of the FSIA," Plaintiffs must

"establish that Cuba was designated a state sponsor of terrorism in 1982 as a result of [their] father's death [and mistreatment]." Vera, 867 F.3d at 318 (citing City of New York v. Permanent Mission of India to the United Nations, 446 F.3d 365, 369 (2d Cir. 2006)).

Plaintiffs cite the Florida Judgment to argue that the United States designated Cuba as a state sponsor of terrorism because of Defendants' acts against Villoldo Argilagos. Opp'n at 4–5. But the Florida Judgment does not include any finding regarding Cuba's designation and Plaintiffs' unsubstantiated assertion that "the actions against the Villoldos were the same actions that resulted in [Cuba's] designation," Opp'n at 4, does not support the conclusion that the United States designated Cuba a sponsor of terrorism in 1982 because of its torture of the Villoldos in 1959. In fact, as the Second Circuit noted in Vera, "the State Department designated Cuba a state sponsor of terrorism generally because of its 'support for revolutionary violence and groups [that] use terrorism as a policy instrument.'" 867 F.3d at 318 (alteration in original) (quoting Regulation Changes on Exports: Hearing Before the Subcomm. on Near E. & S. Asian Affairs of the S. Comm. on Foreign Relations, 97th Cong. 13 (1982) (statement of Ernest Johnston, Jr., Deputy Assistant Sec'y for Econ. Affairs, Dep't of State)). Other courts have reached similar conclusions. E.g., Jerez, 775 F.3d at 425 ("Cuba was designated as a 'state sponsor of terrorism' particularly based on 'evidence of Cuban support for revolutionary violence and groups which use terrorism as a policy instrument.'" (quoting 82 Dep't of State Bull., No. 2063, at 56 (June 1982)). Because Plaintiffs offer no evidence linking Cuba's terrorist designation to Villoldo Argilagos's abuse and death, they have failed to establish that Defendants' 1959 acts fall under § 1605A.

*2. Defendants' Post-1982 Acts*

The Florida court also concluded that § 1605A applied to Plaintiffs' claims because Defendants' conduct "continued until the middle of 2003 with threats of assassination and assassination attempts." Florida Judgment at 6. The court cited no evidence to support its finding of fact and it is unclear what, if anything, the court relied on to conclude that Defendants attempted to assassinate Plaintiffs.[3] Plaintiffs offer little more to enable the Court to conclude that Defendants ever made assassination attempts. In addition to the Florida Judgment's conclusory findings, Plaintiffs point to a 2013 judgment from the same Florida court enforcing the Florida Judgment against a third party. Opp'n at 6 (citing Dkt. No. 139-2 ("2013 Judgment")). Specifically, Plaintiffs cite the following language from the 2013 Judgment:

> [T]he Court heard testimony that, on numerous occasions, armed assassins surrounded the Villoldos' home for the purpose of causing severe mental distress and as part of the Defendants' effort to assassinate members of the Villoldo family, including Gustavo Villoldo. The Court heard testimony from Elia Villoldo, who testified that she and her family would be trapped inside their home witnessing men armed with rifles surrounding the home in an attempt to murder Gustavo Villoldo.

2013 Judgment ¶ 11. The Florida court did not cite any specific testimony in either the Florida Judgment or the 2013 Judgment. Likewise, Plaintiffs have not offered any testimony to support the court's conclusions. Nor do Plaintiffs offer any evidence regarding when and where these alleged assassination attempts occurred, how Plaintiffs determined the alleged assassins were Cuban agents, or whether any of the attempts resulted in physical injury. Without these and other

---

[3] As the Comptroller notes, Mem. at 9, neither Plaintiffs' complaint nor their amended complaint in the Florida action contain allegations of assassination threats or attempts, Dkt. Nos. 135-4 ("2008 Complaint"), 135-8 ("2011 Amended Complaint").

critical facts, the Court has no basis to conclude that Defendants attempted to assassinate Plaintiffs. Therefore, Plaintiffs may not rely on the post-1982 acts to invoke the FSIA's terrorism exception.

The Comptroller further argues that even if Plaintiffs presented evidence that Defendants made assassination threats and attempts, those acts do not qualify as "torture" under § 1605A. Mem. at 10–11. The FSIA incorporates the definition of "torture" used in the Torture Victim Protection Act of 1991 ("TVPA"). § 1605A(h)(7). Under the TVPA, torture is defined as:

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . , whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73, 73 (1992). The TVPA defines "mental pain or suffering" as:

> prolonged mental harm caused by or resulting from—
>
> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
>
> (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
>
> (C) the threat of imminent death; or
>
> (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

Id. § 3(b)(2).

As the Comptroller correctly notes, Mem. at 10, "[t]he TVPA's definition of torture is 'rigorous.'" Mohammad v. Tarraf, No. 02-CV-282, 2007 WL 1040031, at *3 (W.D.N.Y. Apr. 4, 2007) (quoting Price. v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 93 (D.C. Cir. 2002)), aff'd sub nom. Mohammad v. Bin Tarraf, 300 F. App'x 87 (2d Cir. 2008). Moreover, the Second Circuit has explained that "the severity requirement is crucial in determining whether conduct is torture and that an act must be a deliberate and calculated act of an extremely cruel and inhuman nature specifically intended to inflict excruciating and agonizing physical or mental pain or suffering in order to constitute torture." Chowdhury v. Worldtel Bangladesh Holding, Ltd., 746 F.3d 42, 52 (2d Cir. 2014). While the Court need not decide whether assassination attempts can ever constitute torture under the TVPA, Plaintiffs have plainly failed to offer evidence that Defendants post-1982 acts satisfy the TVPA's severity requirement. The Court cannot conclude that Defendants' alleged assassination attempts constituted "act[s] of an extremely cruel and inhuman nature specifically intended to inflict excruciating and agonizing physical or mental pain or suffering." Id. Were Plaintiffs to provide evidence that Defendants made "imminent death threats," they may be able to establish torture under the TVPA. Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1252 (11th Cir. 2005). But with no such evidence before it, the Court cannot conclude that the alleged assassination attempts constitute torture. Therefore, Plaintiffs cannot rely on Defendants' post-1982 acts to invoke the terrorism exception.[4]

---

[4] The Court need not reach the Comptroller's argument that Plaintiffs were not U.S. nationals at the time of Defendants' 1959 acts. Mem. at 8–9. While the Comptroller is correct that the Florida court never addressed whether Plaintiffs were U.S. nationals in 1959, because

14

For these reasons, the FSIA's terrorism exception does not apply here. Defendants were immune from suit in the Florida action, and the Florida Judgment is void. Therefore, the Court lacks subject matter jurisdiction over this case, and it must be dismissed. Plaintiff's Turnover Motion must also be denied because the Court lacks jurisdiction to enforce it.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Comptroller's Motion (Dkt. No. 135) is **GRANTED**, and this case is **DISMISSED for lack of subject matter jurisdiction**; and it is further

**ORDERED**, that the Writ of Execution (Dkt. No. 20) and the Court's 2016 Order (Dkt. No. 66) are **VACATED**; and it is further

**ORDERED**, that Plaintiffs' Turnover Motion (Dkt. No. 127) is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED: October 24, 2017
Albany, New York

Lawrence E. Kahn
U.S. District Judge

---

Plaintiffs have failed to establish acts of torture, the Court need not consider whether they have established that they were qualifying nationals at the relevant times.